# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                 )

CASA SYSTEMS, INC.,             )

                )

            Plaintiff,       )

                )

          v.         )        Civil Action No.

                )

GRANT BLOOM,            )

                )

          Defendant.    )

_____)

## VERIFIED COMPLAINT

1.      Casa Systems, Inc. ("Casa") brings this action against its former employee, Grant Bloom, seeking (i) the return of Casa's confidential and proprietary information and to prevent any further dissemination of that information, and (ii) to enforce Bloom's non-competition, non-solicitation, and confidentiality obligations, which Bloom violated by commencing employment with a direct competitor of Casa as a salesperson working in the same territory that he served on Casa's behalf, jeopardizing Casa's legitimate interests in protecting its customer goodwill and confidential information.

2.      While employed by Casa, Bloom had access to, and indeed was required to know and to use, Casa's highly sensitive confidential information, including pricing information, current and former contracts, customer history, information on contract negotiation and pitches, sales strategies, and other information concerning Casa's customers and prospective customers and its relationships with those companies and individuals.

3.      On February 28, 2020, Bloom abruptly tendered his resignation.  He did not reveal to Casa that he had already accepted a position with Harmonic.

4.      Examination of Bloom's emails shows that he sent highly confidential information about Casa's customers and Casa's strategy with respect to them from his company laptop to his personal email account.

5.      Bloom's actions violate his agreements with Casa, as well as the Defend Trade Secrets Act, 18 U.S.C. §1831, et seq. (the "DTSA"), and the Massachusetts Trade Secrets Act, Mass. Gen. L. c. 93, §42, et seq.  Casa seeks an injunction and expedited discovery to protect its interests in its customer goodwill and confidential information, and to prevent further irreparable harm.

## PARTIES

6.      Casa Systems, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Old River Road, Andover, Massachusetts.

7.      Upon information and belief, Grant Bloom is a citizen of the State of Maine.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action under 28 U.S.C. §1332 because the parties are citizens of different states, and the matter in controversy exceeds $75,000 excluding interest and costs.

9.      This Court also has federal question jurisdiction pursuant to 28 U.S.C. §1331, because Casa asserts claims under the DTSA and the CFAA.  Supplemental jurisdiction exists over the remaining claims in this action pursuant to 28 U.S.C. §1367, because they are related to and arise from the same set of operative facts as the DTSA and CFAA claims.

10.     This Court has personal jurisdiction over Bloom, and venue is proper in this District, because Bloom consented to the jurisdiction and venue of the federal and state courts situated in Massachusetts when he signed his Non-Competition and Non-Solicitation Agreement and his Assignment, Invention and Non-Disclosure Agreement with Casa.  *See* Exhibit A, §2(h); Exhibit B, §6(g).

## FACTS

**A.     Casa's Business**

11.     Casa is a global leader in hardware and software for cable and mobile broadband networks.  Casa invents, designs, manufactures, and sells a full range of equipment and software to assist cable and mobile providers in providing cost-effective, fast, innovative services to their customers.  Casa employs more than 950 individuals around the world.

12.     The industry in which Casa operates is highly competitive, and Harmonic Inc. is a direct competitor to Casa, providing hardware and software to the same potential customers as alternatives to Casa's products.  On information and belief, Harmonic employs over 1,300 individuals globally.

13.     Bloom worked for Casa from its headquarters in Andover, Massachusetts, where he worked for more than nine years.  Throughout his employment, he was responsible for sales to customers located in the Caribbean and Latin America, a region referred to as "CALA," which in Casa's usage includes 25 countries from Mexico south, including Brazil, Argentina, Colombia, Chile, and others.

14.     In 2019, customers in the CALA region made up approximately 8.5% of Casa's more than $282 million in revenue.

15.     Casa's team for the CALA region consisted of four sales employees, including Bloom, and approximately ten engineers.  Bloom was personally responsible for Casa's largest accounts in the region, and also oversaw the rest of the team, with overall responsibility for sales performance in the region.

16.     Casa uses an application called SalesForce to store all pricing and customer information.  Although access to SalesForce was restricted, Bloom had full access to the tool for information concerning sales and prospects within the CALA region.  He thus had access to all price files, all current and former customer contracts, RFPs, responses to RFPs, customer preferences, and contact information for every customer in the CALA region.

17.     Casa also stores sales presentations, customer quotes, and other information in a shared network folder (the "OneDrive").  Access to information on the OneDrive is also password-protected, but Bloom again had full access to those folders, both from his office desk and remotely by logging in to Casa's network from outside.

18.     As a regional vice president, Bloom attended weekly global sales calls hosted by Alfred de Cardenas, the head of global sales for Casa, and so was aware of major deals and customers outside the CALA region as well.

19.     Casa has developed its pricing and customer information and market and pricing analyses through the investment of significant time and resources.  This information is not available to the public.  It is safeguarded with, among other things, password-protected access, and by restricting access to only those employees with a need to know the information.  If disclosed, this information would give any Casa competitor, certainly including Harmonic, an unfair competitive advantage.

**B.     Bloom's Employment with Casa**

20.     Bloom was hired effective January 10, 2011, as Director of Sales – CALA.  In December, 2014, he was promoted to Regional Vice President of Sales – CALA.  His title changed in January 2020 to Account Vice President – CALA, but his compensation did not change.

21.     In his sales role, Bloom oversaw three other sales employees working in the CALA region.  He had responsibility for dozens of contract negotiations, contracts, and meetings with key customers.  He engaged in weekly sales calls where customer demos and sales forecasts were discussed, traveled frequently to South America to meet both with his own accounts and with customers assigned to other sales representatives, and engaged in frequent conference calls to discuss customer information.  He received daily reports, updates, and strategic analyses on customers in the CALA region.  He was also intimately involved in pricing, acting as the liaison between the CALA sales team and Casa's finance department to obtain approval for prices

offered to customers.  He also regularly prepared and managed the process of responding to requests for proposals ("RFPs") from large customers in the region.

22.     Bloom also managed a number of Casa's largest CALA accounts day-to-day, maintaining relationships with those customers and engaging in weekly strategic sales calls to discuss pricing, RFPs, customer accounts, and other confidential information.

**C.     Bloom's Post-Employment Contractual Obligations**

23.     In addition to password protection and other restrictions on access to its confidential information, Casa also requires certain employees who gain access to that information to agree to covenants to maintain its confidentiality, not to misappropriate it, and not to misuse it on behalf of a competitive business.

24.     Specifically, as a condition of employment, Bloom signed the Non-Competition and Non-Solicitation Agreement, a true and accurate copy of which attached as <u>Exhibit A</u>.

25.     That Agreement contains post-employment restrictive covenants designed to protect Casa's goodwill, its customer and employee relationships, and its confidential information.  Specifically, Bloom promised not to accept employment with a competitor for one year after the end of his employment with Casa:

> While the Employee is employed by the Company and for a period of one year after the termination or cessation of such employment for any reason, Employee will not directly or indirectly . . . [e]ngage in any business or enterprise . . . that is competitive with the Company's business, including but not limited to any business or enterprise that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service . . . [of] the Company while the Employee was employed by the Company.

Ex. A, §1(a).

26.     Bloom further acknowledged that these restrictions "are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose."  *Id.* §2(g).  He agreed that if he were to breach his promise, doing so "is likely to cause the Company substantial and irrevocable damage which is difficult to measure."  *Id.*

27.     Also as a condition of employment, Bloom entered into the Assignment, Invention and Non-Disclosure Agreement attached hereto as Exhibit B.  That Agreement defines protected Proprietary Information to mean information "of a private, secret or confidential nature concerning the Company's business, business relationships or financial affairs," including "by way of illustration":

> Inventions, products, processes, methods, techniques, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, *customer and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company*.

Ex. B, §1(a) (emphasis added).  Bloom promised that he:

> will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an Employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

*Id*.

28.     Bloom further agreed that any documents containing Proprietary Information "shall be and are the exclusive property of the Company, and that any such materials "shall be delivered to the Company, upon . . . termination of his employment."  *Id*. §1(b).  He further promised that he would "not retain any such materials or copies thereof or any such tangible property."  *Id*.

29.     In addition to asking employees to sign the Agreements, which contains covenants that protect Confidential Information and require the return of Casa's property upon termination, Casa takes the following measures to protect its confidential and trade secret information: (a) prohibiting the use of Casa materials for purposes not directly related to its business, or the removal or borrowing of its property without permission; (b) using badge IDs to restrict access to and within its facilities; (c) prohibiting the use of its computer systems for non-company purposes; (d) restricting access to its computerized information through the use of

passwords; and (e) restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

**D.    Bloom's Resignation and Immediate Employment with Harmonic**

30.    Bloom discussed employment with Harmonic while he was still employed by Casa.  Harmonic eventually sent him an offer letter dated February 24, 2020, a copy of which is attached as <u>Exhibit C</u>.  Harmonic offered Bloom a position as "Senior Director, Cable Business Development, LATAM."  On information and belief, "LATAM" is an acronym for Latin America, and the territory for which Bloom is now responsible on behalf of Harmonic overlaps substantially and perhaps entirely with the territory in which he worked for Casa.  Harmonic offered Bloom an annual base salary of $160,000, plus an opportunity to earn commissions with a target of an additional $160,000 per year.  He also received restricted stock representing 9,500 shares of Harmonic's stock.

31.    Upon information and belief, Harmonic was willing to make this generous offer to Bloom to work in its LATAM territory because of his network of contacts and customer relationships and his knowledge concerning those customers and prospective customers, all of which he had developed over nine years on behalf of Casa.

32.    On February 28, 2020, Bloom gave notice of his resignation.  He did not reveal that he had accepted a position at Harmonic, much less that he had accepted a position in sales with a substantially similar territory to the region he had worked in for Casa.  He did not return to work after February 28, and upon information and belief immediately began work on behalf of Harmonic, though the termination of his employment with Casa did not become effective until March 13, 2020.

33.    Harmonic is a direct competitor of Casa's, in the CALA/LATAM region and elsewhere in the world.  Harmonic sells products and services that the market views as alternatives to products and services offered by Casa.

34.    In particular, Harmonic and Casa currently are competing in response to a request for proposal from Claro Brazil, a large provider of telecommunications services in more than

2,000 cities in Brazil.  Overall, Claro provides such services in some 16 Central and South American countries.  Casa and Harmonic are competing to provide cable modem termination systems ("CMTS"), including both the products and associated services, to Claro.  CMTS is at the core of Casa's product offering.  Claro is just one of many customers in the CALA region that are regularly in the market for products and services provided by Casa and Harmonic.

35.     Bloom has long been aware that Casa and Harmonic are competitors, as a result of his nine years of employment with Casa.  He regularly listed Harmonic as a competitor in sales charts that he prepared for internal Casa presentations over several years.

36.     The services that Bloom is now providing to Harmonic and on its behalf violate the post-employment obligations he owes to Casa, and pose a significant risk that Proprietary Information and trade secrets have been or will be used to aid in or create unfair competition favoring Harmonic.

**E.      Bloom's Unauthorized Possession of Casa's Proprietary Information**

37.     At the time of his resignation and hire by Harmonic, Bloom had a Casa laptop in his possession and a Casa Systems email account.

38.     Review of Bloom's Casa email account, which Casa conducted after learning that Bloom had accepted employment at Harmonic, revealed that he has been sending Casa's Proprietary Information to his personal email address for years, including hundreds of slides and spreadsheets showing Casa's sales performance, its performance against its competition, market share, strengths and weaknesses, outlook for the coming year, and key customer contacts and organizational charts.

39.     For example, on September 4, 2019, Bloom sent a spreadsheet to his personal email address with a draft of materials for an upcoming sales meeting.  The email and a redacted version of some of the spreadsheet Bloom sent to himself is attached as <u>Exhibit D</u>.  These excerpts list the "Top 3 Strategic GROWTH Opportunities for Casa (2020-2022)," detailing for each the opportunity, the customer name, the expected spend, potential revenue, Casa's "key differentiator," what Casa needed to do to meet the customer need, and the names of responsible

individuals at the customer.  The page attached as Exhibit D list these top opportunities for cable products; other worksheets in the same document provided similar information as to "fixed products," "4G 5G Radio Access Products," and "5G Core Product."  There was no legitimate business reason for Bloom to have sent this highly confidential document to his personal email address.

40.     On February 18, 2020, just six days before the Harmonic offer letter and ten days before he gave notice of his resignation, Bloom exchanged emails with Claro Brazil's Purchasing and Supply Manager concerning Casa's ability to participate in the CMTS project referred to above.  *See* Exhibit E.  The email includes the name and email address of the Claro manager, who copied two other Claro employees on his response to Bloom.  The following day, February 19, Bloom forwarded the exchange to his personal email address.  There was no legitimate business reason for Bloom to have done so.

41.     RVM continues to conduct an investigative analysis of the Casa laptop used by Bloom.  So far, the total invoiced cost to Casa for these services is $3,500.00.

## COUNT I

## BREACH OF CONTRACT

42.     Casa hereby realleges and incorporates by reference the allegations in Paragraphs 1-41, above.

43.     The Agreements that Bloom entered into with Casa, attached as Exhibits A and B, are valid and enforceable contracts.

44.     Casa performed all of its duties and obligations under those Agreements.

45.     The post-employment restrictions contained in the Agreements are reasonable in both scope and duration, and reasonably necessary to protect Casa's legitimate interests in the confidentiality of its proprietary business information and trade secrets, as well as its business relationships, customer goodwill, and other legitimate business interests.

46.     Bloom breached his contractual obligations to Casa by providing services to and on behalf of Harmonic, and by taking and failing to return Casa's information upon his resignation.

47.     As a result of these breaches of contract, Casa has been irreparably injured, and continues to face irreparable injury.  Casa is threatened with losing the value of its confidential information and certain customer relationships and goodwill.  Casa also has suffered monetary injury as a result of Bloom's breach, in an amount to be proved at trial.

## COUNT II

## VIOLATION OF DEFEND TRADE SECRETS ACT

48.     Casa hereby realleges and incorporates by reference the allegations in Paragraphs 1-41, above.

49.     Casa possesses information of independent economic value that is not available to the public, not readily ascertainable by proper means, and could convey an economic benefit to another person that obtains it.

50.     This information constitutes a trade secret.

51.     Casa undertakes reasonable measures to maintain the secrecy of its trade secrets, including: (a) asking employees to sign the Agreements, which contain covenants that protect Proprietary Information and require the return of Casa property upon termination; (b) prohibiting the use of Casa materials not directly related to its business, or the removal or borrowing of its property without permission; (c) using badge IDs to restrict access to and within its facilities; (d) prohibiting the use of its computer systems for non-company purposes; (e) restricting access to its computerized information through the use of passwords; and (f) restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

52.     Bloom had substantial and on-going access to Casa's trade secrets as a result of and during the course of his employment with Casa.

53.     Upon information and belief Bloom took Casa's trade secrets with him and failed to return that information for the benefit of Harmonic and to unjustifiably interfere and unfairly compete with Casa's business.

54.     Despite Casa's best efforts, Bloom has not returned all of the protected, confidential, and/or trade secret information.

55.     By misappropriating and/or using Casa's trade secrets, Bloom has created an unfair advantage for Harmonic in competing with Casa, including targeting Casa's customers, and Harmonic has acquired a valuable roadmap for poaching Casa's customer relationships and goodwill, at Casa's expense.

56.     Bloom has misappropriated Casa's trade secrets through willful, malicious, and improper means.

57.     Bloom's actions constitute a willful and malicious violation of the DTSA, 18 U.S.C.A. § 1839, et seq.

58.     As a result of Bloom's violation of the DTSA, Casa has been injured and will continue to be damaged by losses of, among other things, customers, revenues, valuable proprietary information and goodwill.

## COUNT IV

## VIOLATION OF MASSACHUSETTS TRADE SECRETS LAW

59.     Casa hereby realleges and incorporates by reference the allegations in Paragraphs 1-57, above.

60.     Bloom's conduct as described herein constitutes a misappropriation of a trade secret within the meaning of Mass. Gen. L. c. 93, §42.

61.     Bloom has misappropriated Casa's trade secrets through willful, malicious, and improper means.

62.     Bloom's actions constitute a willful and malicious violation of the Massachusetts Trade Secrets Act, Mass. Gen. L. c. 93, §§42-42G.

63.     As a result of Bloom's violation of the Massachusetts Trade Secrets Act, Casa has been injured and will continue to be injured by losses of, among other things, investments in its trade secrets, customers, revenues, valuable proprietary information and goodwill.

**PRAYER FOR RELIEF**

WHEREFORE, Casa seeks judgment in its favor and an Order against Defendant Bloom that grants the following relief:

(a)     Permanently enjoining Bloom and all parties in active concert or participation with him from directly or indirectly: i) using or disclosing any of Casa's confidential, proprietary and/or trade secret information; ii) working on behalf of Harmonic during the period of his noncompetition agreement; iii) soliciting Casa clients with whom Bloom worked or about which he acquired Proprietary Information during his employment with Casa; or iv) otherwise engaging in any conduct which violates Bloom's Non-Competition and Non-Solicitation Agreement or his Assignment, Invention and Non-Disclosure Agreement;

(b)     Ordering Bloom and all parties in active concert or participation with him to return to Casa all originals and copies of all files, devices and/or documents that contain or relate to Casa's confidential and proprietary information, including without limitation, all computers, electronic media, data, iPhones and electronic storage devices;

(c)     Ordering Bloom to produce for inspection and imaging all computers and other electronic storage devices and email and cloud storage accounts belonging to, under the control of, accessible to, or operated by Bloom, or which may contain Casa Confidential Information, including but not limited to grantbl02@yahoo.com and gbloom5666@gmail.com.

(d)     Awarding Casa actual, incidental, compensatory, and consequential damages to be proven at trial;

(e)     Awarding Casa exemplary or punitive damages pursuant to the DTSA, 18
        U.S.C. § 1831, et seq., for Bloom's willful and malicious conduct;

(f)     Awarding Casa damages assessed under the DTSA, 18 U.S.C. § 1831, et
        seq., including compensatory damages, unjust enrichment or restitution
        damages (disgorgement for ill-gotten gains) and reasonable royalty
        damages;

(g)     Awarding Casa damages assessed under the Massachusetts Trade Secrets
        Act, including compensatory damages, unjust enrichment or restitution
        damages (disgorgement for ill-gotten gains) and reasonable royalty
        damages;

(h)     Awarding Casa its costs and expenses incurred herein, including
        reasonable attorneys' fees and interest; and

(i)     Awarding Casa such further relief as the Court deems just and appropriate.

### REQUEST FOR A JURY TRIAL

Casa requests a trial by jury on all claims so triable.

Respectfully submitted,

CASA SYSTEMS, INC.

By its attorneys,


  /s/ Mark W. Batten
Mark W. Batten, BBO No. 566211
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110-2600
Tel.:  617.526.9600
Fax:  617.526.9899


Dated: April 21, 2020

## VERIFICATION

I, Lucy Xie, hereby verify and attest that I am the Senior Vice President for Operations for Casa Systems, Inc., that I am authorized to make this verification on behalf of Casa, and that I have read the foregoing Verified Complaint.  The matters stated therein are true to the best of my knowledge, and knowledge I have acquired on behalf of Casa from other parties within Casa or from agents of Casa.

Signed under the pains and penalties of perjury this *17th* day of April, 2020.

Lucy Xie

# TAB A

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Agreement is made between Casa Systems, Inc., a Delaware corporation (hereinafter referred to collectively with its subsidiaries as the "Company"), and *Grant Bloom* (the "Employee").

For good consideration and in consideration of the employment or continued employment of the Employee by the Company, the Employee and the Company agree as follows:

1. <u>Non-Competition and Non-Solicitation</u>. While the Employee is employed by the Company and for a period of one year after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly:

(a) Engage in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 1% of the outstanding stock of a publicly-held company) that is competitive with the Company's business, including but not limited to any business or enterprise that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Employee was employed by the Company; or

(b) Either alone or in association with others, sell or attempt to sell to any person or entity that was, or to whom the Company had made or received a proposal to become, a customer or client of the Company at any time during the term of the Employee's employment with the Company, any products or services which are competitive with any products or services developed, manufactured, marketed, sold or provided by the Company; or

(c) Either alone or in association with others (i) solicit, or permit any organization directly or indirectly controlled by the Employee to solicit, any employee of the Company to leave the employ of the Company, or (ii) solicit for employment, hire or engage as an independent contractor, or permit any organization directly or indirectly controlled by the Employee to solicit for employment, hire or engage as an independent contractor, any person who was employed by the Company at the time of the termination or cessation of the Employee's employment with the Company; <u>provided</u>, that this clause (ii) shall not apply to the solicitation, hiring or engagement of any individual whose employment with the Company has been terminated for a period of six months or longer.

2. <u>Miscellaneous</u>.

(a) <u>Extension</u>. If the Employee violates the provisions of Section 1, the Employee shall continue to be bound by the restrictions set forth in Section 1 until a period of one year has expired without any violation of such provisions.

(b) <u>Not Employment Contract</u>. The Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue his/her employment for any period of time and does not change the at-will nature of his/her employment.

(c)    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which, or into which, the Company may be merged or which may succeed to the Company's assets or business, provided, however, that the obligations of the Employee are personal and shall not be assigned by him or her.

(d)    Interpretation. If any restriction set forth in Section 1 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(e)    Severability. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

(f)    Waivers. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(g)    Equitable Remedies. The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose. The Employee agrees that any breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is difficult to measure. Therefore, in the event of any such breach or threatened breach, the Employee agrees that the Company, in addition to such other remedies which may be available, shall have the right to obtain an injunction from a court restraining such a breach or threatened breach and the right to specific performance of the provisions of this Agreement and the Employee hereby waives the adequacy of a remedy at law as a defense to such relief.

(h)    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the Commonwealth of Massachusetts (or, if appropriate, a federal court located within Massachusetts), and the Company and the Employee each consents to the jurisdiction of such a court. The Company and the Employee each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement.

(i)    Amendment. This Agreement may be amended or modified only by a written instrument executed by both the Company and the Employee.

(j)    Captions. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

- 2 -

WALTHAM 39541v1

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

CASA SYSTEMS, INC.

Employee: _~YBloom_____

By: _____

Date: _01/10/11_____

Date _1/10/11_____
(Signature)

WALTHAM 39541v1

# TAB B

## ASSIGNMENT, INVENTION AND NON-DISCLOSURE AGREEMENT

This Agreement is made between Casa Systems, Inc., a Delaware corporation (hereinafter referred to collectively with its subsidiaries as the "Company"), and *Grant Bloom* (the "Employee").

In consideration of the employment, or the continued employment of the Employee by the Company, and the sale and issuance of shares of common stock of the Company to the Employee, the Company and the Employee agree as follows:

1.      Proprietary Information.

(a)     The Employee agrees that all information, whether or not in writing, of a private, secret or confidential nature concerning the Company's business, business relationships or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, customer and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. The Employee will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as a Employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

(b)     The Employee agrees that all files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, or other written, photographic, or other tangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company. All such materials or copies thereof and all tangible property of the Company in the custody or possession of the Employee shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment. After such delivery, the Employee shall not retain any such materials or copies thereof or any such tangible property.

(c)     The Employee agrees that his obligation not to disclose or to use information and materials of the types set forth in paragraphs (a) and (b) above, and his obligation to return materials and tangible property, set forth in paragraph (b) above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Employee.

2.      Developments.

(a)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, discoveries, methods, developments, software and works of authorship, whether patentable or not, (i) which have been created, made, conceived or reduced to practice by the

Employee or under his direction or jointly with others prior to the date hereof and which relate directly or indirectly to the business of developing, marketing or selling any video-on-demand solution (the "Business"), including, without limitation, such items listed on <u>Schedule I</u> attached hereto, or (ii) which are created, made, conceived or reduced to practice by the Employee or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments").

(b)     The Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to all (i) items listed on <u>Schedule I</u> attached hereto, (ii) patent rights, trademarks, copyrights, trade secrets and other intellectual property rights related directly or indirectly to the Business and (iii) Developments and all related patents, patent applications, copyrights and copyright applications. However, this paragraph 2(b) shall not apply to Developments which do not relate to the present or planned business or research and development of the Company and which are made and conceived by the Employee not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information. Developments not assigned by this Agreement are listed and described on the "Schedule of Separate Works" attached hereto as <u>Schedule II</u>. The Employee understands that, to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 2(b) shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. The Employee also hereby waives all claims to moral rights in any Developments.

(c)     The Employee agrees to cooperate fully with the Company, both during and after his employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Developments. The Employee shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Development. The Employee further agrees that if the Company is unable, after reasonable effort, to secure the signature of the Employee on any such papers, any executive officer of the Company shall be entitled to execute any such papers as the agent and the attorney-in-fact of the Employee, and the Employee hereby irrevocably designates and appoints each executive officer of the Company as his agent and attorney-in-fact to execute any such papers on his behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Development, under the conditions described in this sentence.

3.     <u>Other Agreements</u>.

The Employee hereby represents that, except as the Employee has disclosed in writing to the Company, the Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with the Company, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party

- 2 -

or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Employee further represents that his performance of all the terms of this Agreement and the performance of his duties as a Employee of the Company do not and will not breach any agreement with any prior employer or other party to which the Employee is a party (including without limitation any nondisclosure or non-competition agreement), and that the Employee will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others. *see last page*

4.   <u>United States Government Obligations</u>.

The Employee acknowledges that the Company from time to time may have agreements with other persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. The Employee agrees to be bound by all such obligations and restrictions which are made known to the Employee and to take all action necessary to discharge the obligations of the Company under such agreements.

5.   <u>No Employment Contract</u>.

The Employee understands that this Agreement does not constitute a contract of employment and does not imply that his employment will continue for any period of time.

6.   <u>Miscellaneous</u>.

(a)   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(b)   This Agreement supersedes all prior agreements, written or oral, between the Employee and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Employee and the Company. The Employee agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

(c)   This Agreement will be binding upon the Employee's heirs, executors and administrators and will inure to the benefit of the Company and its successors and assigns.

(d)   No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(e)   The Employee expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ the Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer.

WALTHAM 39539v1

(f)      The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose.  The Employee agrees that any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, the Employee agrees that the Company, in addition to such other remedies which may be available, shall be entitled to specific performance and other injunctive relief.

(g)      This Agreement is governed by and will be construed as a sealed instrument under and in accordance with the laws of the Commonwealth of Massachusetts (without reference to the conflicts of laws provisions thereof).  Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the Commonwealth of Massachusetts (or, if appropriate, a federal court located within Massachusetts), and the Company and the Employee each consents to the jurisdiction of such a court.

THE EMPLOYEE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

CASA SYSTEMS, INC.

Employee : _MBloom_

By: _____

President      CFO

Date: _01/10/11_

_01/10/11_

*Currently has an existing non-solicitation agreement in effect with Motorola.

MB
DGB

- 4 -

WALTHAM 39539v1

# TAB C



February 24, 2020

Grant Bloom

Dear Grant,

I am pleased to offer you the position of Senior Director, Cable Business Development, LATAM, reporting directly to Gil Katz, Senior Vice President, Cable Access Business Operations.

You will receive a starting bi-weekly salary of $6,153.85, which equates to $160,000.00 on an annualized basis (for computational purposes only).

You will be eligible to participate in the 2020 Sales Commission Plan with a (prorata) annual commission target of $160,000.00.

All of the above amounts are subject to federal and state tax withholdings.

Also, upon commencement of your employment, you will receive 9,500 restricted stock units (RSU's), each unit representing one share of Harmonic Common Stock, subject to approval by the Compensation and Equity Ownership Committee of the Board of Directors.  These RSU's will vest incrementally over a two year period.  More details to follow.

Harmonic offers a comprehensive benefits package which includes health and welfare plans, a 401(k) savings plan, and an employee stock purchase plan.  We reserve the right to modify or change our benefits at any time in our sole discretion. We will provide you with additional information regarding our complete list of fringe benefits during your orientation session.

Before starting, you must sign the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement and bring documentation for completion of the I-9 (employment verification) form.  Your employment with Harmonic is at-will, which means either party can choose to terminate the relationship at any time for any reason whatsoever, with or without cause.

This offer of employment is valid until the close of business on February 26,2020, contingent upon the satisfactory completion of reference checks and a background check.  Please let us know of your acceptance by signing one copy of this offer letter and returning it to us via email to Victoria Wagadarikar Victoria.Wagadarikar@harmonicinc.com
.

Grant, I look forward to you accepting our offer and becoming a member of our team!


Sincerely,

Nimrod Ben-Natan
Senior Vice President and General Manager, Cable Access Business
Harmonic, Inc.

Acceptance:


_____
Grant Bloom


Anticipated Start Date: _____

# TAB D

| Top 3 Strategic GROWTH Opportunities for Casa (2020 - 2022) |
|---|

**Opportunity 1:** ███████

| | |
|---|---|
| **Account:** | |
| Sales Leader: | Patricio Latini |
| Account/Customer Profile: | ████████████ |
| Current Casa Business Profile: | ██ |

| | |
|---|---|
| Opportunity Description: | ███ |
| Objective Customer trying to Achieve (Problem they are trying to solve) | ██████████ |
| Current  **(Supplier or Vendor)** fcr Product or Greenfield | ████ |
| Approximate Annualized Current Capital Spend in this Area ($0C0) | ██ |

| Potential Casa Revenue | 2020 ($000) | 2021 ($000) | 2022 ($000) |
|---|---|---|---|
| | $ ████ | $ ████ | $ ████ |

| | |
|---|---|
| Description of **Casa** Product Offering: | |
| What is the key Differentiator Casa has or We feel we need to win business (Why us?) | ████████ |
| Is Product Available today from Casa? (Y/N): | █ |
| If NO, What is MVP (Minimum Viable Product) requirement | ● |
| Key decision point for Customer (Is there a compelling event for decision) | █████ |

| Who are the **R.A.P.I.D** customer players? | |
|---|---|
| R = Recommender (who will be the individual(s) that give recommendations to Decision maker) | ██████ |
| A = Approvers (Who approves the decision) | |
| P = Perform (who wll be delivery team) | █████ |
| I = Input (who is/are individuals that provide input into decisior | ████ |
| D - DECISION (who is the key decision maker) | ███ |

**Opportunity 2:** ██████

| | |
|---|---|
| **Account:** | |
| Sales Leader: | Patricio Latini |
| Account/Customer Profile: | ██████████ |
| Current Casa Business Profile: | |

| | |
|---|---|
| Opportunity Description: | |
| Objective Customer trying to Achieve (Problem they are trying to solve) | █████████ |
| Current  **(Supplier or Vendor)** fcr Product or Greenfield | ███ |
| Approximate Annualized Current Capital Spend in this Area ($0C0) | $█ |

| Potential Casa Revenue | 2020 ($000) | 2021 ($000) | 2022 ($000) |
|---|---|---|---|

| | $ | | $ | | $ | |
|---|---|---|---|---|---|---|
| Description of **Casa** Product Offering: | | | | | | |
| What is the key Differentiator Casa has or We feel we need to win business (Why us?) | | | | | | |
| Is Product Available today from Casa? (Y/N): | | | | | | |
| If NO, What is MVP (Minimum Viable Product) requirement: | | | | | | |
| | | | | | | |
| Key decision point for Customer (Is there a compelling event for decision | | | | | | |
| | | | | | | |
| Who are the **R.A.P.I.D** customer players? | | | | | | |
| **R** = Recommender (who will be the individual(s) that give recommendations to Decision maker | | | | | | |
| **A** = Approvers (Who approves the decision) | | | | | | |
| **P** = Perform (who will be delivery team) | | | | | | |
| **I** = Input (who is/are individuals that provide input into decision | | | | | | |
| **D** - DECISION (who is the key decision maker) | | | | | | |

**Opportunity 3:**

| | | | |
|---|---|---|---|
| Account: | | | |
| Sales Leader: | Patricio Latini | | |
| Account/Customer Profile: | | | |
| Current Casa Business Profile: | | | |
| | | | |
| Opportunity Description: | | | |
| Objective Customer trying to Achieve (Problem they are trying to solve) | | | |
| Current **(Supplier or Vendor)** for Product or Greenfield | | | |
| | | | |
| Approximate Annualized Current Capital Spend in this Area ($000) | | | |
| Potential Casa Revenue | 2020 ($000) | 2021 ($000) | 2022 ($000) |
| | $ | $ | $ |
| Description of **Casa** Product Offering: | | | |
| What is the key Differentiator Casa has or We feel we need to win business (Why us?) | | | |
| Is Product Available today from Casa? (Y/N): | | | |
| If NO, What is MVP (Minimum Viable Product) requirement: | | | |
| | | | |
| Key decision point for Customer (Is there a compelling event for decision) | | | |
| | | | |
| Who are the **R.A.P.I.D** customer players? | | | |
| **R** = Recommender (who will be the individual(s) that give recommendations to Decision maker) | | | |
| **A** = Approvers (Who approves the decision) | | | |
| **P** = Perform (who will be delivery team) | | | |
| **I** = Input (who is/are individuals that provide input into decision | | | |
| **D** - DECISION (who is the key decision maker) | | | |

Top 3 Strategic GROWTH Opportunities for Casa (2020 - 2022)

**Opportunity 4:**

| | |
|---|---|
| Account: | |



| | | | |
|---|---|---|---|
| Sales Leader: | Grant Bloom | | |
| Account/Customer Profile: | █████████ | | |
| Current Casa Business Profile: | | | |

| | | | |
|---|---|---|---|
| Opportunity Description: | ████████ | | |
| Objective Customer trying to Achieve (Problem they are trying to solve) | ████████████████ | | |
| Current (Supplier or Vendor) for Product or Greenfield | ██████ | | |
| Approximate Annualized Current Capital Spend in this Area ($000) | ████ | | |

| Potential Casa Revenue | 2020 ($000) | 2021 ($000) | 2022 ($000) |
|---|---|---|---|
| | $ ████ | $ ████ | $ ████ |

| | |
|---|---|
| Description of Casa Product Offering: | ███████ |
| What is the key Differentiator Casa has or We feel we need to win business (Why us?) | █████████ |
| Is Product Available today from Casa? (Y/N): | █ |
| If NO, What is MVP (Minimum Viable Product) requirement: | █████████████ |
| Key decision point for Customer (Is there a compelling event for decision) | ███████████ |

| | |
|---|---|
| Who are the R.A.P.I.D customer players? | |
| R = Recommender (who will be the individual(s) that give recommendations to Decision maker) | ██████████ |
| A = Approvers (Who approves the decision) | ████████ |
| P = Perform (who will be delivery team) | |
| I = Input (who is/are individuals that provide input into decisior | |
| D - DECISION (who is the key decision maker) | ███████ |

# TAB E

**From:** Grant Bloom
**Sent:** Wednesday, February 19, 2020 1:57 AM
**Subject:** Fwd: CASA Systems - Proyectos Wireline en 2020

Get Outlook for iOS

**From:** ██████████████████@claro.com.co>
**Sent:** Tuesday, February 18, 2020 6:18:01 PM
**To:** Grant Bloom <gbloom@casa-systems.com>
**Cc:** ██████████████████████@claro.com.co>; ████████████████
██████████@claro.com.co>
**Subject:** RE: CASA Systems - Proyectos Wireline en 2020

Hola Grant,

Perfecto. Quedamos en contacto.

Saludos,



**Director Compras Y Abastecimiento**
█████████████████
Ext: 0
███████@claro.com.co

Conmutador: Bogotá: 7480000 - 7500300, Cali: 4880000, Medellín: 6041000, B/quilla: 3870000

**AVISO DE CONFIDENCIALIDAD:**
Este correo electrónico, incluyendo en su caso, los archivos adjuntos al mismo, pueden contener información de carácter confidencial y/o privilegiada, y se envían a la atención única y exclusivamente de la persona y/o entidad a quien va dirigido. La copia, revisión, uso, revelación y/o distribución de dicha información confidencial sin la autorización por escrito de Comunicación Celular S.A Comcel S.A está prohibida. Si usted no es el destinatario a quien se dirige el presente correo, favor de contactar al remitente respondiendo al presente correo y eliminar el correo original incluyendo sus archivos, así como cualesquiera copia del mismo. Mediante la recepción del presente correo usted reconoce y acepta que en caso de incumplimiento de su parte y/o de sus representantes a los términos antes mencionados, Comunicación Celular S.A Comcel S.A tendrá derecho a los daños y perjuicios que esto le cause.

**CONFIDENTIALITY NOTICE:**
This e-mail message including attachments, if any, is intended only for the person or entity to which it is addressed and may contain confidential and /or privileged material. Any review, use, disclosure or distribution of such confidential information without the written authorization of Comunicación Celular S.A Comcel S.A is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. By receiving this e-mail you acknowledge that any breach by you and/or your representatives of the above provisions may entitle Comunicación Celular S.A Comcel S.A to seek for damages.

**From:** Grant Bloom <gbloom@casa-systems.com>
**Sent:** Tuesday, February 18, 2020 3:32 PM
**To:** ██████████████████@claro.com.co>
**Subject:** CASA Systems - Proyectos Wireline en 2020

Hola ██████

Gracias por recibir my llamada hace algunos minutos, en referencia a nuestras actividades mutuas en proyectos CMTS en 2020.

Me habia preocupado algo, que tuvimos la impression aqui que habia demora en invitar a CASA Systems para nuestra participacion en el **Proyecto 2020 Crecimiento CMTS**.

Pero, le agradezco mucho tu confirmacion hoy en nuestra llamada que no hay ningunas restricciones en negocios entre Claro y CASA Systems.

Nos mantenemos en contacto y le visitare bien pronto en Bogota.


Saludos,

Grant Bloom
(M) +1